United States Fidelity & Guaranty Co. v. Village of Bassfield.*

(Division A.   Sept. 26, 1927.)

[114 So. 26.   No. 26109.]

1. DEPOSITARIES. *County treasurer can lawfully deposit public funds in bank not legal depository; existence of one in county not being shown.*

   A county treasurer has right to deposit public funds intrusted to him in a bank which is not a legal depository; existence of one in the county not being shown.

2. DEPOSITARIES. *County treasurer, making deposit in bank not legal depository, has right to receive security.*

   County treasurer has right to demand and receive security for deposit of public funds made by him in a bank which is not a legal depository, provided the bank has power to pledge it to him.

3. BANKS AND BANKING. *Power to secure deposit of public funds is presumed to be in president and cashier.*

   In the absence of proof showing limitation or restriction of power of bank cashier, imposed by the laws of the bank or by the board of directors, he is presumed to have power of attending to the ordinary active business functions of the bank.

4. Banks and Banking. *Pledge by cashier and president to secure deposit of public funds held authorized.*

    Pledge by bank cashier and president to secure deposit of public funds, though not expressly authorized by board of directors, is within their power rather than that of the executive committee, a creature solely of the board of directors, with such powers only as are vested in it by the board.

5. Banks and Banking. *Bank can pledge assets to secure deposit of public money.*

    A bank can pledge its assets as security for a deposit of public money; this not being *ultra vires* and being consonant with public policy.

---

*Corpus Juris-Cyc. References: Banks and Banking, 7CJ, p. 544, n. 67 New; p. 545, n. 85 New; p. 547, n. 15; p. 549, n. 70, 71; p. 552, n. 89; p. 558, n. 75 New; p. 592, n. 70; Depositaries, 18CJ, p. 585, n. 33; p. 591, n. 68. On power of bank to pledge assets to secure deposit of public moneys, see annotation in 45 L. R. A. (N. S.) 950; 3 R. C. L. 419; 1 R. C. L. Supp. 822.

(Division B. Oct. 3, 1927.  Suggestion of Error Overruled Nov. 14, 1927.)

Appeal from chancery court of Jefferson Davis county. Hon. T. P. Dale, Chancellor.

Suit by the United States Fidelity & Guaranty Company against the Village of Bassfield. Judgment for defendant, and plaintiff appeals. Reversed and judgment rendered.

*Stevens & Heidelberg* and *Wm. M. Hall,* for appellant.

I. *Was there a valid pledge of the bonds?* The authority relied on by counsel for appellee at the trial to support the contention that a Mississippi bank has no right or power validly to pledge its assets to secure a deposit of public funds, is the case of *Commercial Bank & Trust Co. et al. v Citizens Trust & Guaranty Co. of West Va.,* 153 Ky. 566, 156 S. W. 100, 37 Am. & Eng. Ann. Cas. 1915C, 166. This case held under the peculiar statutes of Kentucky that a Kentucky bank had no power to secure the payment of a depositor of public funds by a pledge of its assets, and that such a pledge was *ultra vires* and illegal.

The court in undertaking to support the statute by reason went far afield and contended that "sound business banking principles demand that no bank should be permitted, under any circumstances, to secure any depositor by a pledge of its assets;" that to permit such a pledge would operate to give preference to one depositor over another and, in effect, constitute a fraud upon other and unsecured depositors.

That decision is declaratory of the public policy of the state of Kentucky no doubt, but it will be observed from an examination of the note to the report of this case in Ann. Cas. 1915C, page 171, that the case is in conflict with the decisions on the question from other states, including those of Illinois, Iowa and Pennsylvania.

It is admitted by the Kentucky court that the holding is in conflict with the statement of Bolles on Modern Law of Banking; Morse on Banking, and Pratt's Digest of National Bank Laws, and so far as we have observed, is in conflict with the statements of all important authors on the law of banking as to the implied powers of banks. These authors are uniform, so far as we have observed, in the statement that amongst the implied powers of a bank is that of borrowing money and securing the same by deposit or pledge of its assets.

The public policy of this state in this regard has been long fixed by legislative enactment and decisions of this court. There certainly can be no serious question, we submit, that a bank organized and doing business in Mississippi has the right and power to secure a deposit of public funds by pledging its assets. Review section 3077, Code of 1892, brought forward as section 3485, Code of 1906. See, also, *George W. Fogg, Tax Collector,* v. *Bank of Friars Point et al.,* 80 Miss. 750, 32 So. 285, decided under this statute in March, 1902. Section 3485, Code of 1906, was amended by chapter 177, Laws of 1922.

*Bank* v. *Fogg, supra,* is cited in the later case of *Adams* v. *Williams,* 97 Miss. 713, 52 So. 872, to support the proposition that public funds collected by a public treasurer do not become in any respect the funds of the treasurer, but remain the property of the public body whose treasurer he is; that instead of being the debtor of the public body, he is its treasurer, the custodian of its funds, and acquires control of the funds without acquiring title to them.

*Commercial Bank* v. *Hardy,* 97 Miss. 755, 53 So. 395, reaffirms the *Fogg case, supra,* and cites *Metcalf* v. *Bank,* 89 Miss. 649, 47 So. 377, in which it was held that under section 3077, Code of 1892 (section 3485, Code of 1906) "public monies deposited by tax collector were entitled to priority of payment over general creditors in case of an assignment by the bank for the benefit of creditors." See, also, *Greene* v. *Cole, County Treasurer, et al.,* 98 Miss. 67, 54 So. 65.

In the above cases it does not appear that any of the deposits were made under a law creating and regulating depositories of public funds. In *Potter* v. *Fidelity & Deposit Co.,* 101 Miss. 823, 58 So. 713, there is introduced for the first time the question what effect, if any, upon the rule announced in the Fogg case and those reaffirming it, the enactment of a public depository law had. In the Potter case, Chief Justice Mayes went into the question of whether or not the state, as sovereign, has a preferential right over general creditors in the absence of a constitutional or statutory provision, and held that the state has no such preferential right.

The Potter case further holds that the Laws of 1908, chapter 1906, without repealing section 3485, provided for the placing of state funds in a selected depository and the taking of security from the depository with the intent that the funds should be used by the depository as any other general fund or deposit; and that a surety company, which has paid to the state the money owed by a bank or trust company selected as a state deposi-

tory under said act, but which bank afterward became
insolvent and went into receivership, and which surety
company afterward sued the bank to establish a right
of subrogation over the state's general creditors, had
no right to priority over the general creditors because
the state itself had no such right under these sections.
A distinction was drawn between the case where public
monies were deposited in the bank by a public official on
his initiative and a case such as that of the cash being
deposited where the statute itself provided for the selec-
tion of the depository and the security to be taken for
the public funds and expressly authorized the making of
the deposit.

Now examine chapter 96, Laws of 1908. The act clear-
ly intends that the funds deposited shall become assets
of the bank and used by it, and commingled with its
other funds, just as would any sum of money borrowed
from any source. See *U. S. F. & G. Co.* v. *First State
Bank of Shaw,* 103 Miss. 91, 60 So. 47, construing section
3485, Code of 1906; *Powell* v. *Board of Sup'rs of Tunica
County,* 107 Miss. 574, 65 So. 499, construing chapter
137, Acts of 1910, as amended by chapter 194, Acts
of 1912, authorizing the selection of county deposi-
tories upon the question of the preferential right of
the county, in case of the failure of a bank so selected
as a depository. See, also, *Board of Levee Commission-
ers* v. *Powell,* 68 So. 71, and later reviewed on suggestion
of error, which was sustained as reported in 109 Miss.
415, 69 So. 215, having under review the statute author-
izing the creation of levee board depositories or deposi-
tories for funds for levee boards, and being chapter 97,
Laws of 1908; *Bank of Commerce* v. *Clark,* 114 Miss. 850,
75 So. 595; *Bank of Commerce* v. *City of Gulfport,* 117
Miss. 591, 78 So. 519, reviewing the city depository act,
chapter 138, Laws of 1910; *Jourdan* v. *Bennett,* 119
Miss. 576, 81 So. 239, again upholding the preference
claim of a county for deposit in bank at the time of the
bank's failure, and holding that this preference claim is

114     U. S. Fid. & Guar. Co. *v.* Bassfield. [Sup. Ct.

Brief for Appellant.     [148 Miss.

superior to that of a depositor to whom the bank had issued bills of exchange on a bank of another city, the issuance of bills of exchange not having changed the relationship of debtor and creditor between the bank and such depositor. See, also, *Sunflower County* v. *Bank of Drew,* 104 So. 355.

The foregoing authorities convincingly demonstrate the solicitude of the legislature and courts of this state to protect public funds which may be deposited in bank and to take every asset of the bank if necessary to repay them. The statutes relating to depositories of state, county and municipality or drainage board expressly authorize the pledging of municipal bonds of the character here involved for the purpose of securing such deposits. Certainly, no harm can flow to any creditor or depositor of the bank if the bank is allowed to secure such public deposits, since the statute gives the deposit absolute preference over all other claims and in effect itself fastens a lien upon every asset of the bank to secure return of the deposit in case the same is made in a bank not qualified under a depository statute.

The treasurer certainly had a right to take the security under the authorities above noted, and it is not contended anywhere in the record that he had any notice of any infirmity in the security or of any payment thereof prior to its being pledged direct to him. We have a case, therefore, where there was a valid conventional pledge of the collateral, and in addition to this there was default on the part of the bank to the treasurer and there was a payment by the surety of the treasurer to the county and both a conventional and legal subrogation of the rights of the treasurer and of the county to the guaranty company.

What are the rights then of the guaranty company in the collateral? See 21 R. C. L., section 31, page 668; section 3733, Code of 1906 (section 2909, Hemingway's Code); section 3732, Code of 1906 (section 2908, Hemingway's Code).

The guaranty company had a right upon payment to the county to go against Baker and to assert the preference in the trust fund which the county enjoyed. Baker having security, it was the right of the guaranty company to be subrogated to that security and to any right Baker enjoyed as against the bank, either by contract or by the law making public funds a trust fund and a prior charge on all assets of the bank.

A surety upon payment of the debt of the principal is subrogated to the securities held by the creditor and to the right to enforce them to obtain reimbursement. *Lee* v. *Griffin,* 31 Miss. 632; *Loughride & Bogan* v. *Bowland,* 52 Miss. 556.

The charge was made in the answer and cross-bill, as above noted, that at the time the pledges were made the bank was insolvent. There is no proof that either Baker or the guaranty company knew that fact, if it was a fact, in 1913 when the original pledge was made, nor was there any proof that the treasurer or the guaranty company had notice of insolvency at the time the pledge was made direct to Baker in 1914, just prior to the failure. We deem it unnecessary to discuss, therefore, the effect of insolvency, but cite: *State* v. *Bank of Maryland,* 26 Am. Dec. 561; 3 R. C. L., section 274, page 645; *Arthur* v. *Commercial & R. R. Bank of Vicksburg,* 9 S. & M. 429; *State of Miss.* v. *Commercial Bank of Manchester,* 13 S. & M. 578.

II. *The right of appellee to complain of ultra vires act of the bank, or of preferential treatment of depositors.* Appellee has no standing in the court to question the power of the bank in this instance to pledge its assets to secure the public deposit in question. When the original pledge was made there was no sort of equity vested in the appellee to complain at that pledging of the collateral, even though it had been, strictly speaking, *ultra vires* the corporation or irregular or improperly preferential.

III. *Was there any payment of the bonds sued on which the village can plead against appellant?* The attempt on the part of the village authorities to take up the two bonds in the manner detailed by Mr. Dear and Mr. McLain, did not constitute any payment of the bonds. The village knew that the bonds were negotiable and, in addition to this, had actual notice from Mr. McLain, who was cashier of the bank, and also city clerk at one and the same time, that the bonds had been pledged to the guaranty company or to the First National Bank, and in delivering a warrant and check for the bonds, simply took the promise of the bank cashier, who was the town clerk, that he would get the bonds and deliver them up to the village. This constituted no payment of the bonds.

The burden of proving payment is upon appellee. *Cage* v. *Iler,* 5 S. & M. 420; *Win* v. *Skipwith,* 14 S. & M. 14, 30 Cyc. 1264; Code of 1906, section 748 (Hemingway's Code, section 531).

If maker pays a note before maturity and fails to take it up and the same is afterwards negotiated to an innocent purchaser for value before maturity, the latter can enforce payment again. 7 Cyc. 1017-18.

Notes pledged to secure liabilities which may arise in the future may be enforced by the creditor as a *bona-fide* holder, providing he has no notice of any equities between the original parties. *Brown* v. *James,* 89 Neb. 475, 114 N. W. 591; *State Bank* v. *Holland* (Tex. Civ. App.), 128 S. W. 435; *Forstall* v. *Fussell,* 50 La. Ann. 249, 31 L. R. A. (N. S.) page 201.

This court should not only reverse the decree of the lower court, but render judgment here.

*Livingston & Milloy,* for appellee.

The law cited by appellant is not in point. The learned chancellor below heard the case and after thoroughly considering the same found for the appellee. This finding of the chancellor must be considered favorably to

appellee unless the chancellor was manifestly wrong in his finding of fact. The chancellor found as a matter of fact from the evidence in the case that appellant was not a holder of the bonds for value and was not a holder in due course. In our judgment the record in this case shows many reasons why appellee should have obtained the decree rendered in this cause in the court below and why the cause should be affirmed.

I. The evidence in this cause conclusively shows that the indemnity contract was not made by the directors of the bank, but was attempted to be made by an executive committee. A valid contract can be made by a corporation only through its directors and not through an executive committee. A legal act can be done only by a board of directors, and they must act collectively.

II. The evidence in this case clearly shows that appellant was engaged in making indemnity bonds for hire; that is, always charged and received a premium, and that appellant is precluded from recovery in this case because there was no consideration paid for the bonds sued on. It occurs to us that the appellant being engaged wholly in making indemnity bonds for hire could not be held to be a holder of negotiable paper in due course when such negotiable paper was placed with it as an indemnity in its own favor where it had made a bond for appellee authorizing the treasurer of the county to deposit public funds in the said bank.

The pledging of the assets of the People's Bank with appellant at the time it is shown to have been pledged was a fraud of the grossest kind as to the other depositors, creditors, and stockholders of the bank and this is clearly settled by *Commercial Banking & Trust Co.* v. *Citizens Trust & Guaranty Co.,* 153 Ky. 556, 156 S. W. 160, 45 L. R. A. (N. S.), 950.

III. The evidence in this case shows that the first indemnity contract attempted to be made between appel-

lant and People's Bank was in March, 1913, and
after appellant had been informed by the bank that
other indemnity companies were then refusing to con-
tinue the making of the indemnity bonds authorizing the
bank to receive deposits of the public money of the
county. This information, we contend, was sufficient to
put appellant on notice that the People's Bank was then
in a failing condition and was an unsafe place in which
to deposit the public money.

The continuation certificate was issued solely upon
the agreement of the cashier who did not, we contend,
have the right in law to bind or assign the assets of the
bank for any purpose and who was not authorized by the
directors of the bank to make the assignment and, there-
fore, could not bind the bank. The evidence shows
further that there was no attempt to have this attempted
transaction between appellant and the cashier ratified
by the bank until two or three days prior to the bank's
closing its doors and this time, the bank was hopelessly
insolvent and appellant had knowledge of this condition
of affairs; and, hence, the pretended ratification was
null and void.

Appellant took no precaution whatever to ascertain
the real financial condition of the bank at the time it
took the assets of the bank as claimed by it, and the
appellant was not and could not in our opinion have been
a purchaser for value or a holder of the assets in due
course. Section 58, Uniform Negotiable Instrument Act
(section 2638, Hemingway's Code); section 52 of said
act (section 2630, Hemingway's Code); section 28 of
said act (section 2606, Hemingway's Code). See *Rylee*
v. *Wilkerson*, 134 Miss. 663, 99 So. 901, 123 Miss. 598,
86 So. 359.

This court has held repeatedly that when circum-
stances in evidence show that the payee from whom the
holder claims came into possession of the notes or bonds
by fraud upon the maker, that the holder then must show
good faith. Receiving property merely as security for

Sept., 1927] U. S. Fid. & Guar. Co. *v.* Bassfield.        119

148 Miss.]                        Brief for Appellee.

a preexisting debt does not constitute the holder a pur-
chaser for value and by reason of our negotiable statute
the same rule applies to bills of exchange, notes, and
bonds taken as security for a debt. *Merchants & Farm-
ers Bank* v. *Bank of Winona,* 64 So. 210; *Meridian First
Nat'l Bank* v. *Strauss,* 66 Miss. 479, 6 So. 232, 14 A. S. R.
579; *Hinds* v. *Pugh,* 48 Miss. 268; *Perkins* v. *Swank,* 43
Miss. 349.; *McLeod* v. *First Nat'l Bank,* 42 Miss. 99; *Pope*
v. *Pope,* 40 Miss. 516.; *Brooks* v. *Whitson,* 7 S. & M. 513;
*Harney* v. *Pack,* 4 S. & M. 229; *Holmes* v. *Carman,* Freem.
Ch. (Miss.) 408.

We are not unmindful that this court has held that
where a note or bond is assigned as collateral security
for an indebtedness then made the negotiable paper is
thereby freed of any defenses existing as between the
maker and the payee. 7 Cyc. 930; *First Nat'l Bank of
Iowa City* v. *John McGrath & Sons Co.,* 72 So. 701.

But this court, so far as we have been able to find has
never passed upon the proposition of assignment of a
negotiable instrument received as an indemnity against
possible future loss. But we find that there is some re-
spectable authority which holds that a negotiable instru-
ment received as an indemnity against possible future
loss, even though that loss afterwards actually occurs
is not taken in the usual course of trade, but remains
subject to latent equities between the original parties.
3 R. C. L., section 270, page 1065; *Bank of Mobile* v.
*Hall,* 6 Ala. 639, 41 Am. Dec. 72; *Andrews* v. *McCoy,* 8
Ala. 920, 42 Am. Dec. 669.

Furthermore, appellant failed to show that the Peoples
Bank of Bassfield was authorized under its charter to
pledge its assets of the bank as indemnity or otherwise
as it failed to introduce the charter of the bank. And
under the law, a bank is not authorized to secure gen-
eral depositors. However, under the Laws of 1908, 1910,
1912, and amendments thereto, banks are permitted to
qualify as municipal, county, state depositories, and
some other depositories, by placing with the proper au-

120    U. S. Fid. & Guar. Co. *v.* Bassfield. [Sup. Ct.

Brief for Appellee.          [148 Miss.

thorities of the municipality, district, county, or state certain specific assets, but this authority is statutory and these statutes cannot be construed to permit banks in Mississippi, unless authorized by their charters, to pledge their assets to secure one depositor over another.

Further, the evidence in this case utterly fails to show that the treasurer either in March, 1913, or March, 1914, had any right whatever under the law to deposit any of the county's money in the People's Bank. In other words, the evidence in the case fails to show that Jefferson Davis county did not have a legally qualified depository in which all of its funds should be deposited. We submit that the burden rested on the appellant to show that there was no qualified depository in Jefferson Davis county, Mississippi, for said years, 1913 and 1914, and its failure to make such proof is, in our judgment, fatal to its cause of action.

The only case that we have found exactly in point is *Commercial Banking & Trust Co.* v. *Citizens' Trust & Guaranty Co. of West Va.,* 153 Ky. 566, 156 S. W. 160, 45 L. R. A. (N. S.) 950 and note. It is a well-considered case and the reasoning therein set forth is sound.

Section 1, chapter 194, Laws of 1912, provides that the treasurer shall keep on deposit the different funds belonging to the county in the state or national banks, or in some of them doing business in the several counties provided that where there is no bank in a county qualified as a depository, some bank in an adjoining county may qualify as a depository, and provided further, that in the event no bank qualifies as a depository, the funds belonging to the county shall be kept by the county treasurer, as then provided by law. The evidence in this case fails to show that there was not a qualified depository in Jefferson Davis county in the years 1913 and 1914 and, therefore, no right is shown by appellant that would or did justify the treasurer in depositing a part of the current county fund in the People's Bank at Bassfield.

Sept., 1927] U. S. Fid. & Guar. Co. *v.* Bassfield.    121

148 Miss.]                    Opinion of the Court.

The chancellor committed no error in the trial of this cause and did not err in rendering a decree for appellee.

McGowen, J. delivered the opinion of the court.

Appellee, the village of Bassfield, issued, among others, two certain school bonds in the principal sum of five hundred dollars each, payable to the bearer, dated December 1, 1909, and due on the 1st day of December, 1919. These bonds were sold to the People's Bank of Bassfield, and subsequently they came into the hands of the appellant, the United States Fidelity & Guaranty Company. The bonds here in controversy having become due, and the village of Bassfield having failed to pay to the appellant the amount of the same, suit thereon in the circuit court of Jefferson Davis county was filed. After pleas were filed by the appellee, the cause was thereupon, by agreement of all parties, transferred to the chancery court of said county, and the pleadings were made up in that court.

The original bill alleged that appellant was the owner and holder in due course of the said bonds, that they were past due and unpaid, and that appellee had failed and refused to pay to appellant the amount due on the same. Copies of the said bonds were attached to the original bills and made exhibits thereto. The prayer of the bill was for a monetary decree against the appellee, and for general relief.

The answer of the appellee admitted that the bonds were duly and legally issued, but denied that the appellant was the holder in due course of the same. The answer also alleged that all amounts due on said bonds had long since been paid to the People's Bank of Bassfield, which was the then holder in due course of said bonds, and that by reason of this payment to the said People's Bank of Bassfield it was discharged from all liability thereon.

The answer also alleged that the appellant was engaged in the business of writing surety bonds in the state of Mississippi, for which it charged a large premium; that, in the course of its business, it had become surety on the official bond of Van B. Baker, the county treasurer of Jefferson Davis county; that the said People's Bank, in order to secure the deposit of the public funds of Jefferson Davis county, executed in favor of the said Van B. Baker, county treasurer, an indemnity bond, with the appellant as surety thereon, and that the public funds of the said company were thereupon deposited in said bank; that appellant had thereupon wrongfully demanded of the said People's Bank that it indemnify appellant against any loss it might suffer by reason of being surety on the said indemnity bond of the People's Bank; and that, pursuant to this demand, an agreement was entered into between the said People's Bank and the appellant whereby certain bonds, among which are the ones here in question, were hypothecated to the appellant; but that said bonds were not as a matter of fact actually delivered to the appellant, but were retained in the possession of the said People's Bank; that this hypothecation agreement was made secretly, without notice of any kind to the appellee, or to any other persons whomsoever.; that it was *ultra vires,* void, and contrary to public policy, was a fraudulent under taking and a fraud on the rights of the appellee and the creditors and stockholders of said People's Bank; that in this state of affairs the amounts due on said bonds were paid by the appellee to the said People's Bank; that said bonds were not then delivered to the appellee by the bank, but it was represented to appellee by the officers of said bank that these bonds were then held by the First National Bank of Hattiesburg, and that they would immediately be obtained and delivered to the appellee; that immediately thereafter the said People's Bank failed and went into the hands of a receiver and then into the hands of the state banking department;

that in due course the said bonds were received by said state banking department from the First National Bank of Hattiesburg, and were by it wrongfully assigned and delivered to the appellant; that this assignment by the state banking department was unlawful, void, contrary to the public policy, and in fraud of the rights of the appellee and of the creditors and stockholders of the said People's Bank.

The answer also alleged that the People's Bank had no right to pledge or assign to the appellant these bonds, except for a valuable consideration and in course of business; that any assignment or pledge to secure a deposit of public moneys in said bank was *ultra vires,* contrary to public policy, a fraud on the rights of the appellee, the creditors, and stockholders of the bank, and that at the time of the signing of the bond of the treasurer with the indemnity company as surety, the People's Bank was insolvent and known so to be by the appellant.

The answer was made a cross-bill and prayed for a discovery showing in detail the manner in which the appellant acquired the bonds and also prayed for a cancellation of the bonds and for other general relief.

The answer to the cross-bill denied payment by appellee of said bonds to said People's Bank or to any one; denied that appellant had notice of any payment to said bank; denied that the bank promised to deliver said bonds to the appellee; denied that the banking department received the bonds from the Hattiesburg Bank; and denied generally all allegations of fraud and bad faith.

The answer to the cross-bill then alleged that appellant came into possession of said bonds in the following manner:

"That it was surety on the official bond of Van B. Baker, treasurer of Jefferson Davis county; that the People's Bank of Bassfield was desirous of securing deposits of the county funds, and, in order to secure said deposits, it, on the 26th day of April, 1913, executed an indemnity bond in favor of the said Van B. Baker, with

appellant as surety thereon, the condition of said bond
being to secure the treasurer against loss of any moneys
deposited in the said People's Bank; that, in order to
indemnify the appellant, the said People's Bank pledged
and delivered to it certain bonds, among which were the
two bonds sued on; that the county moneys were there-
upon deposited by the said county treasurer in the bank
and remained on deposit there until the bond expired on
the 25th day of March, 1914; that by continuation cer-
tificate the indemnity bond was continued in effect for
another year, the pledge of the bonds and the agree-
ments pertaining thereto remaining the same. On the
10th day of April, 1914, the said People's Bank, acting
through and by its president and its cashier, and in order
to secure said treasurer for his deposit with it, assigned
to him all its rights and interests in and to those cer-
tificates then held by the First National Bank of Com-
merce of Hattiesburg, among which were the bonds here
in question, and instructed the said First National Bank
to deliver the said securities to the said treasurer after
the debt of the People's Bank to it had been paid. The
executive committee of the bank, on the 20th day of
April, 1914, ratified and confirmed this action of the pres-
ident and the cashier.

By agreement between the bank, the county treasurer,
and the appellant, the indemnity bond of the treasurer
to the bank was thereupon canceled; the treasurer ac-
cepting as his security in lieu thereof the certificates
assigned to him by the bank as above set forth.

It is further alleged that on the 24th day of April, 1914,
said People's Bank closed its doors and passed into
the hands of the state banking department; that due and
legal demand was made by the county on the treasurer
to account for the moneys of the county; that the treas-
urer made due and legal demand on the bank for the
moneys deposited by him with it; that, the bank being
unable to pay the same, the appellant, as surety on the
official bond of the said treasurer, paid the same to the

treasurer, who thereupon made settlement with the county; that the appellant took from said treasurer an assignment of his statutory preference, right to payment out of the funds of the bank, and also took an assignment of those securities pledged to him by the said People's Bank as security for his deposit; that, in the course of liquidating the affairs of the bank, a compromise agreement was reached between the appellant and the banking department, by the terms of which the appellant was to have a preference claim of seventy-five per cent. of the amount due it, and a common creditors' claim of twenty-five per cent. of those amounts; that, in payment of the seventy-five per cent. preference claim, certain bonds and securities of the bank were delivered by the state banking department to the appellant, among these bonds and securities being the bonds here in question; and that the affairs of the bank were liquidated many years ago, and the appellant left in possession of the bonds here in question.

The testimony offered for appellant showed that the bonds in question had been in its possession since the 23d day of April, 1913, that appellant had acquired and held them substantially in the manner set forth in its answer to the cross-bill, and that it had no notice of any payment of said bonds to the bank.

The testimony also showed that the president and the cashier of the bank were officers of the village, being alderman and clerk, respectively; that funds of the village were on deposit in the bank; that on April 8, 1914, the amounts due on said bonds were paid to the said bank by warrant drawn on the bank and payable out of the school sinking fund; that the bonds were not then due, were not in the possession of the bank, nor were they delivered by the bank to appellee; but that representation was made to appellee that these bonds would immediately be obtained and delivered to it.

The proof failed to show that appellant either knew of or had notice of the insolvency of the People's Bank at

the time of the first pledge of the bonds in 1913, or at
the time of the issuance of the continuation certificate in
1914. The People's Bank was not a legally qualified de-
pository under the depository law, nor had it made any
effort to so qualify as a depository.

In view of the fact that the conclusion we have reached
disposes of the case, we deem it unnecessary to enter in-
to a discussion of all the legal questions raised in the
briefs.

The following are the propositions discussed and dis-
posed of by the court:

First. Was it unlawful for the county treasurer to
deposit the public funds placed in his hands as a public
official in a bank, even though the bank was not a legal
depository, its existence in that county not having been
shown?

Second. Did the cashier, the president of the bank,
and its executive committee have the authority to pledge
the assets of the bank as security for a deposit by a pub-
lic official of funds in his hands as such, in the absence
of a showing that such pledge was affirmatively au-
thorized by the board of directors of said bank?

Third. Has a bank the power to pledge its assets as
security for the deposit of public moneys?

Van B. Baker, county treasurer, had the right to de-
posit in the People's Bank of Bassfield those county
funds which were intrusted to his care and keeping, al-
though the said bank had not qualified as a county de-
pository; and it was not unlawful for the said Van B.
Baker to demand of, and to receive from, the People's
Bank security for such deposit of public funds, provided
the bank itself had the power to pledge such security to
him. *Board of Levee Commissioners* v. *Powell,* 109 Miss.
415, 69 So. 215; *Weddington* v. *Jones,* 41 Tex. Civ. App.
463, 91 S. W. 818; *Richards* v. *Osceola Bank,* 79 Iowa,
707, 45 N. W. 294; *Bank of Commerce* v. *Clark,* 114 Miss.
850, 75 So. 595.

It is next insisted that, in the instant case, the pledge of the bonds to the county treasurer could under no circumstances be valid, because of the fact that it was made by the president, the cashier, and the executive committee of the bank and not by its board of directors. This contention cannot be maintained. Here the original pledge of the bonds was made by the cashier of the bank, acting in his official capacity, while the second pledge of the bonds. was made by the president and the cashier of the bank in their official capacity; their action in this regard having been subsequently ratified by the executive committee of the bank.

The office of president is ordinarily one of dignity and of an indefinite general responsibility, rather than of accurately defined and known powers. The powers inherent in a president by virtue of his office are few.

Generally, in our state and elsewhere, the cashier is the chief executive officer of the bank; the powers inherent in him by virtue of this office being larger, more varied, and more extensive than those of any other officer of the bank. Through him the entire financial and business operations of the bank are carried on and conducted. The power of attending to and disposing of the ordinary and active business functions of the bank is inherent in him; and, in the absence of proof showing some limitation or restriction of his powers placed on him by the laws of the bank or by the board of directors in this respect, it must be presumed that there is no such restriction, and that he does have and may exercise such powers.

The executive committee of a bank is a creature solely of the board of directors. It has no inherent powers, but enjoys only those which are vested in it by the action of its creator, the board of directors. The record here does not disclose just what powers were conferred on, and are enjoyed by, the executive committee.

In the instant case, when the president and the cashier of the bank pledged these bonds to the county treasurer

128    U. S. Fid. & Guar. Co. *v.* Bassfield. [Sup. Ct.

Opinion of the Court.                    [148 Miss.

to secure a deposit of public funds, they were acting in their ordinary and usual business capacity, and were performing one of the ordinary and usual business functions of the bank. Their action in so doing is therefore valid, even though not expressly authorized by the board of directors; their action in this respect being the action of the bank itself. Bolles, in his treatise on the Modern Law of Banking, makes the following statement:

"He (the managing officer) can receive . . . special deposits of public money and give security therefor." Bolles, Modern Law of Banking, p. 356, section 24.

See, also, Morse on Banking, vol. 1, pp. 331, 363, 364; *Richards* v. *Osceola Bank,* 79 Iowa, 707, 45 N. W. 294; *Johnson Co.* v. *Chamberlain Banking House,* 80 Neb. 96, 113 N. W. 1055; C. J. vol. 7, section 163 (d), p. 552.

In view of the conclusions just stated, the question sharply presented for decision is, Has the bank power to pledge its assets as security for a deposit of public moneys?

On behalf of appellant, it is urged that such pledge is valid, is conducive to good, sound business, and is protective of the interest of the people in their public moneys. On behalf of appellee, it is insisted that any action taken by a bank in this respect is *ultra vires* and void, is contrary to public policy, and is a fraud on the rights of the creditors and depositors of the bank.

A review of the statutes and decisions of our courts shows that it has been the policy of this state to protect and secure to the public the money deposited by their officials in the various banks of the state. Section 3485, Code of 1906, provides:

"All money deposited in bank, or with any other depository, by or for a tax collector, or other officer having the custody of public funds, state, county, municipal, or levee board, whether the same be deposited in the name of the officer as an individual or as an officer, or in the name of any other person, is *prima-facie* public money and a trust fund, and is not liable to be taken by

Sept., 1927] U. S. Fid. & Guar. Co. *v.* Bassfield.    129

148 Miss.]    .    Opinion of the Court.

the general creditors of the officer or by the creditors of the depository.''

This statute, in effect, has been construed by our court in numerous cases to hold that deposits of public moneys create a trust fund for the benefit of the public, and that a charge is impressed on all the assets of the bank for the payment thereof; this charge extending to and covering property acquired and paid for by the bank prior to the date of the deposit of the public funds in preference to judgment creditors of the bank. *Fogg* v. *Bank of Friars Point,* 80 Miss. 750, 32 So. 285; *Metcalf* v. *Bank,* 89 Miss. 649, 41 So. 377; *Commercial Bank* v. *Hardy,* 97 Miss. 755, 53 So. 395; *Green* v. *Cole,* 98 Miss. 67, 54 So. 65.

Chapter 96, Laws of 1908, provides for the creation of state depositories; and chapter 137, Laws of 1910, as amended by chapter 194, Laws of 1912, provides for the creation of county depositories. These statutes were construed by this court in the cases of *Potter* v. *Fidelity & Deposit Co.,* 101 Miss. 823, 58 So. 713, and *Powell* v. *Tunica County,* 107 Miss. 410, 65 So. 499, Ann. Cas. 1916B, 1262, wherein it was held that, inasmuch as the statutes carefully prescribed the manner of the selection and qualification of the depository, and also provided for the safety of the public deposits by requiring the bank to deposit certain securities with the public officials, when any such public funds were deposited in such a legally qualified depository, they were no longer trust funds, but had entirely lost that characteristic; that the relation of creditor and debtor arose between the county and the depository; and, in the event of the depository becoming insolvent, the county must look solely to its securities for payment, and, failing in that, must take its place along with the general creditors of the bank.

In the case of *Powell* v. *Tunica County, supra,* it was further held, however, that, when a legally qualified depository received public funds in excess of the amount for which it had qualified as such depository, then such excess funds did not lose the characteristic of being trust

148 Miss.—9.

funds, but are protected by, and subject to, the provisions of section 3485, Code of 1906.

In the case of *Board of Levee Commissioners* v. *Powell,* 109 Miss. 415, 69 So. 215, the statute authorizing the creation of levee board depositories was construed. The levee board depository statute, after providing the method for the selection and qualification of the depository and for the amount and kind of securities to be deposited by it, also provides:

"That the creating of this additional security and the acceptance of the collateral hereinbefore mentioned shall not be construed as waiving any rights, benefits or privileges conferred . . . upon the commission in the manner of recovering public moneys or trust funds . . . which they may deposit."

In the original opinion by Justice Reed, a majority of the court held that the levee board funds deposited in a legally qualified depository were not trust funds, notwithstanding the language of the statute quoted *supra.* See *Board of Levee Commissioners* v. *Powell,* 109 Miss. 154, 68 So. 71. On suggestion of error by a divided court, it was held in that case that the deposit of levee board funds was not only protected by the securities and by the bond given by the bank, as required by the statute, but also that such funds deposited by the commissioners of the levee board were trust funds, and therefore were protected under the provisions of section 3485, Code of 1906. *Levee Commissioners* v. *Powell,* 109 Miss. 415, 69 So. 215.

These statutes indicate the trend of the legislative mind, and the cases construing the statute reflect the solicitude of this court to give full force and effect to the clearly defined legislative policy. Manifestly, this policy is to secure the public interest first; and, in order to so protect it, all deposits of public moneys are declared trust funds and are given preference over all other creditors of the bank. By the statutes creating depositories for the state, counties, municipalities, and levee and

Sept., 1927] U. S. Fid. & Guar. Co. *v.* Bassfield. 131

148 Miss.]                    Opinion of the Court.

drainage districts, the pledging of assets of the bank in the form of bonds is expressly allowed for the securing of such deposits; and the statute making deposits of public moneys in a bank, other than a legal depository, trust funds, and making them a charge on all the assets of the bank in preference to other creditors, has, in effect, itself pledged all the assets of the bank for the payment of the deposits whether expressly pledged by the bank or not.

In the instant case, on the faith of the pledge of the security, which included the bonds here in controversy, the deposits of the public moneys of the county were obtained by the bank, and its assets were increasd by so much. No fraud has been practiced on the depositors or the creditors of the bank; and presumably this particular pledge was known to the directors, as they are required by statute, at stated periods to inquire into and examine the books, securities, and affairs of the bank. Their rights and interests have in no wise been affected. The pledge of the bonds, instead of being contrary to the public policy of this state, on the other hand, is in accord and consistent therewith, and in furtherance of the express public policy of the state in this regard.

Counsel, however, rely strongly on the case of *Commercial Bank & Trust Co. et al.* v. *Citizens Trust & Guaranty Co. of West Virginia,* 153 Ky. 566, 156 S. W. 160, 45 L. R. A. (N. S.) 950, Ann. Cas. 1915C, 166, which case held that a bank is without power to pledge its assets to secure the payment of a deposit of public funds. That case was decided under the provisions of the peculiar banking statutes of Kentucky. The statutes themselves precribed the powers to be enjoyed by banks; and, inasmuch as the power to pledge its assets to secure deposits was not specifically designated as one of these powers, it was held that the bank could not exercise it. The following from this case is quoted:

"This section of the statute [Ky. St., section 579] limits and defines the business of the bank, and directs

that it may be carried on by doing the things specifically enumerated. The enumeration of these powers excludes other methods of banking. The legislature seems to have been especially careful to define the power of banks, and to have been unwilling that these corporations should be allowed to do business, without definite limitations. The officials of one bank might deem it possessed of other and more extraordinary powers than would those of another bank. It was unquestionably the intention of the legislature to define and limit their powers by law, so that all banks should conduct their legitimate business in the same manner, and that the public, dealing with them, might know the power they possessed. So careful were the lawmakers in this respect that they even enumerated the right to take bonds from officials, to appoint and discharge them, which power would seem to be inherent in all corporations. It will be observed that section 579, in enumerating the powers of a bank, specifies 'receiving deposits and allowing interest thereon.' From the earliest times banks, under the common law, have been accustomed to receive deposits. This has been understood to be one of their legitimate functions, but the payment of interest on deposits is a modern custom, which has grown up under the sharp competition existing between banks. Section 579 legalized this custom of paying interest. Without this provision it would manifestly be unlawful under any circumstances, where the powers of banks are defined either by special charter or under general law. Consequently, the lawmakers conferred upon banks the power to pay interest on deposits; hence it is lawful in Kentucky to do so. It is a dangerous power, and may be used in more ways than one to wreck a bank, but, when prudently and legitimately used, it may, and no doubt does, benefit the stockholders. This right to pay interest, however, is as far as the lawmakers apparently felt it safe to go.

"In this case, the bank has exceeded its express power, and, under the claim of the exercise of an implied power.

has attempted to secure the payment of a depositor by the pledging of its assets. This is clearly an act *ultra vires* and unlawful. No such power has been conferred upon banks in this state, nor should authority to do so be granted anywhere. Section 579 grants only such powers 'as may be necessary to carry on the business of banking' by doing the things enumerated."

And the court summed up in the following language:

"In other words, the legislature evidently did not intend that the security of any depositor should be impaired, in order that that of another might be increased. So the only reasonable construction that can be placed upon these statutes, requiring certain public funds to be secured by the depositary, is that the security that such depositary shall give must be other than a pledge of its own assets.

"There is no statute requiring the deposits of the county treasurer to be secured by the depositary, and there is no express power, under which the bank was authorized to secure him, by a pledge of its assets, no necessity existed for its doing so, in order to enable it properly to conduct its business as a banking institution; hence its attempt to do so was an act *ultra vires* and void. The chancellor erred in holding that it did have such power."

The further statement by the court in that case that "sound business banking principles demand that no bank should be permitted, under any circumstances, to secure any depositor by a pledge of its assets," certainly does not accord with the well-defined public policy of this state in so far as the deposit of public moneys is concerned, although it is doubtless expressive of the policy of that state as outlined by the statute there construed by the court.

The courts of those states that have had before them for decision the proposition here presented have adopted the view contrary to that taken by the Kentucky court in the *Commercial Bank Case, supra.* That a bank has the power to pledge its liquid assets to secure one of its de-

positors is sustained by the cases of *Wylie* v. *Bank,* 63 S. C. 406, 41 S. E. 504; *Ward* v. *Johnson,* 95 Ill. 215; *Richards* v. *Osceola Bank,* 79 Iowa, 707, 45 N. W. 294; *Ahl* v. *Rhoads,* 84 Pa. 319; *Weddington* v. *Jones,* 41 Tex. Civ. App. 463, 91 S. W. 818; *State of Nebraska* v. *First National Bank of Orleans* (C. C.), 88 F. 947; *McFerson, National Bank Commissioner, v. National Surety Co.,* 72 Colo. 482, 212 P. 489; and *Cameron* v. *Christy,* 286 Pa. 405, 133 A. 551. The views as expressed by the text-writers and the rule as announced by them is also contrary to that laid down in the Kentucky case. The principle here involved is tersely stated by Morse as follows:

"A bank may receive special, specific and general deposits and give security for them." Morse on Banks and Banking, vol. 1, section 63, p. 122.

In the case of *Ward* v. *Johnson,* 95 Ill. 215, the Merchants', Farmers' & Mechanics' Bank created an investment department. The depositors in this investment department were issued for their deposits certain investment certificates, which were secured by a deed of trust on certain of the assets of the bank in the form of notes and other collateral. The bank, under its charter, had the power to receive money on deposit and to pay interest therefor. The court held that this pledging of the assets of the bank to secure the depositors in the investment department was within the powers of the bank; the court in the course of its opinion making the following statements:

"The corporatioin was authorized to contract and agree with persons desiring to make deposits or loan money as to the terms. It might execute its bond, note, or certificate as evidence of the indebtedness, and secure the same by pledge or chattel mortgage, or note, securities, etc., or by real estate mortgage or trust deed, just as should be mutually agreed. And there has been no reason suggested, and we can conceive of none, why providing a system for securing loans and deposits generally in a particular way is objectionable, when it would not

be objectionable to conduct a single transaction in that way. The business is simply that of the bank obtaining money, and, so far as the public was concerned, presumably needed in its business, and securing it by a trust deed upon terms mutually satisfactory to the respective parties in interest.''

In the case of *Richards* v. *Osceola Bank*, 79 Iowa, 707, 49 N. W. 294, it was held that an official of a bank authorized to do business for it, who has executed and given in the name of the bank a bond authorized by statute for the security of public deposits made in the bank, has the right and the authority to deliver to the county treasurer making such deposit further security; this security consisting of the assets of the bank, and being for the purpose of further protecting the county in its deposits.

In the case of *Ahl* v. *Rhoads*, 84 Pa. 319, a bank, in order to secure a large amount of deposits which it had received from a customer in the regular course of business, and ''as an inducement to [him] to keep a large balance in his favor in his deposit account,'' assigned to him as collateral security a mortgage held by the bank. The court held that the bank had the authority to execute this assignment of its assets to the depositor as security; such assignment not constituting an increase of the bank's indebtedness without the consent of the stockholders within the meaning of a constitutional provision forbidding, such an increase.

In the case of *McFerson, State Bank Commissioner* v. *National Surety Co. et al.*, 72 Colo. 482, 212 P. 489, the bank agreed with the county treasurer to give to him an indemnity bond to secure public funds deposited with it. The National Surety Company thereupon became surety on this bond of the bank, but required of, and received from, the bank collateral to indemnify it against possible loss on said bond. It was insisted that the deposit of this collateral with the surety company was unlawful and void as an attempt to prefer one creditor of the bank over the others. The court in that case, in hold-

ing the deposit of this collateral to be within the powers enjoyed by the bank, said the following:

"There is no question that a bank, in order to secure deposits, may give security for them. The giving of the indemnifying bonds was within the authority of the banks, and was a matter of ordinary business. The banks owned the securities pledged to the surety company, and had full right so to pledge them. It is further undoubted that when collateral has been pledged as security the pledgor has no right to such collateral until the purpose of the pledge has been fulfilled. It is unnecessary to cite authorities on these points."

The case of *Cameron* v. *Christy*, 286 Pa. 405, 133 A. 551, is as follows: The Carnegie Trust Company, having on deposit a large amount of county funds, in order to retain the deposit and prevent the withdrawal thereof by, the tax collector, executed to the said tax collector its indemnity bond and pledged to him as collateral security certain bonds which were the property of the Trust Company and a part of its assets. The question presented for decision was whether or not the trust company had the power to pledge its assets to secure one of its·depositors. The court, in that case, discussed the Kentucky case of *Commercial Bank & Trust Co.* v. *Citizens Trust & Guaranty Company*, which was·there, as is here, relied upon to sustain the contention that a bank has no power to pledge its assets to a depositor, and distinguished it from the case there at bar as being a decision based solely on the peculiar banking statutes of that state, and the construction placed on them by the Kentucky court. The court therefore declined to adopt the view announced in the Kentucky case, but held·the pledge of the assets of the bank to secure this depositor to be valid.

After a careful examination and consideration of the authorities, we are of the opinion that the majority rule is the sounder 'and better rule to adopt. We therefore align ourselves with the majority, adopting the views

taken by them as being reasonable and consistent with the public policy of this state in further guaranteeing to the public the safety of its deposits in the various banks of the state; and, in so doing, we are but adhering to the general legislative policy of this state in protecting public funds as hitherto interpreted by our court. Let it be noted, however, that the case before us is one in which public funds only are involved.

The judgment of the lower court will therefore be reversed, and judgment entered here for appellant.

*Reversed, and judgment here for appellant.*